IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | HON. JEROME B. SIMANDLE |
| v. | Criminal No. 05-787 (JBS) |
| BISHOP KRABSZ, | **AMENDED OPINION** |
| Defendant. | |

APPEARANCES:

Christopher J. Christie
United States Attorney
By:  Jacqueline M. Carle
     Assistant United States Attorney
U.S. ATTORNEY'S OFFICE
401 Market Street, 4th Floor
Camden, New Jersey 08101
     Attorney for the United States of America

Carl D. Poplar, Esq.
CARL D. POPLAR, P.A., A PROFESSIONAL CORPORATION
1010 Kings Highway South
Building Two – Suite A
Cherry Hill, New Jersey 08034
     Attorney for Defendant Bishop Krabsz

**SIMANDLE**, District Judge:

On October 6, 2005, federal agents searched Defendant's private residence pursuant to a warrant issued the day before by Judge Joel B. Rosen, U.S. Magistrate Judge.  The search uncovered, among other things, a gun which was seized.  On November 2, 2005, a federal grand jury sitting in Camden returned a one-count Indictment against Bishop Krabsz, a convicted felon, charging him with knowingly possessing in and affecting commerce a firearm in violation of 18 U.S.C. § 922(g)(1) and 2.

Defendant has moved to suppress the items seized from his residence.[1]  Defendant does not challenge here the existence of probable cause to believe Defendant committed tax crimes.  (Def. Br. at 18.)  Instead, Defendant seeks suppression on the grounds that (1) the warrant is an unconstitutional general warrant; (2) there was no probable cause to find the items to be seized at his residence; and (3) the gun was discovered during a second unauthorized search following completion of the initial search.

For the following reasons, the Court rejects Defendant's Fourth Amendment challenges.  Accordingly, the motion to suppress will be denied and the Government will be permitted to introduce at trial evidence seized pursuant to the warrant.

## I.   FACTUAL BACKGROUND

This case began as an investigation by the Internal Revenue Service ("IRS") into Defendant Bishop Krabsz and his business partner, Kevin Rankin.  Based on information uncovered during the investigation, IRS Special Agent Laura A. Capra prepared a

---

[1] The Court issued an Opinion an Order dated June 2, 2006 denying Defendant's suppression motion.  Defendant subsequently moved for reconsideration, and the Court heard additional argument and testimony at a suppression hearing on August 3, 2006.  The Court has fully considered the parties' arguments in connection with the reconsideration motion and, as indicated at the August 3rd hearing, will vacate its June 2, 2006 Opinion and Order pursuant Rule 1.1 of the Local Criminal Rules and L. Civ. R. 7.1(i).  This Amended Opinion is issued addressing all aspects of Defendant's suppression motion, including supplemental submissions and evidence, and an appropriate Order will be entered.

lengthy affidavit in support of search warrants for the following properties: (1) Defendant's private residence in Cherry Hill, New Jersey; (2) Kevin Rankin's private residence in Philadelphia, Pennsylvania; (3) Dangerous Curves, an adult entertainment club located in Philadelphia, Pennsylvania; and (4) a restaurant/bar named the Ashburner Inn located in Philadelphia, Pennsylvania. The Court here is concerned only with the search of the Cherry Hill residence.

    A.   <u>Search Warrant</u>

    The affidavit in support of the search warrant application states that Agent Capra had:

> probable cause to believe that Kevin Rankin and Bishop Krabsz – the owners and operators of an adult entertainment club in Philadelphia known as Dangerous Curves and two of the investors in a restaurant/bar in Philadelphia known as the Ashburner Inn – conspired to defraud the United States, filed materially false personal tax returns for tax years 2001, 2002, 2003 and/or 2004, willfully evaded and failed to account for, withhold, and pay federal payroll taxes for at least some of the employees of Dangerous Curves, structured cash transactions to evade reporting requirements, and/or willfully failed to file certain returns . . . .

The affidavit recites that while Defendant reported total income of less than $50,000 for each of the specified years, he claimed a total income of more than $200,000 for one of those years in connection with a bank loan application.[2]

---

[2] Once again, Defendant does not challenge for present purposes the existence of probable cause to believe Defendant committed tax crimes.

Attachment B-2 authorized the search for the following items at Defendant's private residence:

For the period of January 1, 2000 through the present, the following records, documents, materials and/or files, whether in paper form or in the form of computerized electronic data, in the name of, or on behalf of: Kevin Rankin, Bishop Krabsz, Dangerous Curves, Ashburner Inn and the business entities which are used to manage, operate, and hold property for Dangerous Curves and Ashburner Inn, and any other entity in which Kevin Rankin and or Bishop Krabsz have a financial interest.

1. All financial records, including bank statements, canceled checks, checkbooks, passbooks, journals, ledgers, checks, drafts, letters of credit, certificates of deposit, wire transfer documents, money orders, withdrawal tickets, deposit slips, money cash bands, records of mutual funds, stocks, bonds, records of real estate transactions, invoices, bills, loan documents, business and financially related correspondence and notes, certificates of insurance, lists of assets, records of safe deposit boxes, and all other items evidencing the obtaining, controlling, transfer, and/or concealment of assets and the obtaining, controlling, transfer, and/or concealment of assets and the obtaining, controlling, transfer, concealment and/or expenditure of money.

2. All checks paid to employees for wages, including the employer's copy of the check stub, Forms W-2, and Forms 1099.

3. All records of cash payments to entities and individuals.

4. All records of money and any other assets sent abroad.

5. Address and/or telephone books, rolodex indices, business cards, and any papers reflecting names, addresses, telephone numbers, pager numbers, facsimile numbers, electronic mail addresses, and/or telex numbers of business associates, sources of supply, customers, employees, temporary

4

worker, drivers used to transport workers,
financial institutions, and other individuals or
businesses with whom a financial relationship
exists.

6.    All tax records, including but not limited to, tax
returns, IRS forms, tax forms of equivalent state
and local agencies, and correspondence with the
IRS or equivalent state and local agencies.

7.    All employee background records including
applications for employment and personnel files.

8.    All corporate and/or business bookkeeping records
and other financial records including trial
balances, general ledgers, general journals,
subsidiary ledgers and journals, disbursement
records and/or journals, accounts payable ledgers
and records, payroll records, loan receivable and
payable ledgers, and cash disbursement journals.

9.    All corporate minute books, Stock Registers or
other records reflecting ownership of corporate
stock.

10.   All financial statements, bookkeeper's work papers
and/or accountant's work papers used in the
preparation of corporate and/or business records
and tax returns.

11.   Electronic equipment, such as computers and fax
machines, and relating manuals used to generate,
transfer, count, record, and/or store the
information described in items 1 through 10 of
this attachment.[3]

(Def. Ex. 2.)

The affidavit additionally states that probable cause

existed to find the items to be seized at Defendant's private

residence: first, on the five separate occasions in September,

---

[3] With respect to computer records, subsections (a) - (c)
further refine the category of items to be seized.

5

2005 that FBI agents conducted surveillance of Defendant's home, Defendant was seen leaving his residence with a briefcase; second, real estate records stated that Defendant is the sole owner of the residence and that electric and water at that location are in his name; third, a review of the mail delivered to the residence on September 27, 2005 revealed that "personal and monthly expense type bills" are mailed to Defendant at his residence; and finally, records from Comcast Corp. show that Defendant has residential high speed internet service at his house.

B.   Search of Defendant's Residence

The warrant application relating to the Defendant's residence in New Jersey was submitted to the Honorable Joel B. Rosen, U.S. Magistrate Judge, who reviewed and signed the warrant on October 5, 2005.[4]  The very next day, at approximately 10:30 A.M., between 10-15 agents executed the search of Defendant's house.  Although Defendant was not present at the time, his fiancé, Lisa Bonett, was present.  According to Bonett, the search covered Defendant's bedroom, including dresser drawers; the outside shed, including plastic bins containing grass seed; the bedroom of Ms. Bonett's 11 year-old son; the area behind a

---

[4] Because three of the four search locations identified in the warrant application are in Pennsylvania, the Government first submitted the search warrant application to a magistrate judge in the Eastern District of Pennsylvania.  That warrant was signed on October 3, 2005.

light fixture on a dresser in the bedroom; and the drawers and closets in a room set aside for Ms. Bonett's brother.  (Bonett Aff. ¶ 7.)

During the search, a firearm was seized from a shoe box on the top shelf of a clothes closet.  According to Agent Jeffrey Huber, an FBI Agent who participated in the search, the firearm was seized between 11:30 and 11:45 A.M., approximately one hour after the FBI and IRS agents arrived to Defendant's home and commenced the search.  Huber testified that once he learned the gun had been seized he informed Ms. Bonett and continued to search the premises.  Shortly before the search concluded at approximately 2:45 P.M., Huber took possession of the firearm and prepared the property receipt for Ms. Bonett's signature.

Bonett stated that at approximately 3:00 P.M. she was brought to the kitchen by an agent who directed her to sign a search warrant inventory prepared by Scott Fitzpatrick of the IRS.  That inventory did not include the firearm.  (Def. Ex. 2.) According to Bonett:

> At the time that I signed the inventory it appeared
> that the search had been concluded.  Agents were
> leaving and taking items out of the house.
> Approximately ½ hours thereafter, at about 3:30 p.m., I
> was directed to the area of the dining room by another
> agent and asked to sign a property receipt for a
> firearm.

(Bonett Aff. ¶¶ 9, 10.)  As already noted, the property receipt listing the firearm was prepared by Agent Huber.  (Govt. Ex. 1.)

7

Agent Huber testified that two separate inventories were prepared, one by the FBI and one by the IRS, solely because of the nature of the items seized.  According to Huber, because the IRS does not typically work firearm cases, he took possession of the firearm and prepared the property receipt for Ms. Bonett's signature at the end of the search.  The seized items which related to the tax investigation, on the other hand, were inventoried by the IRS.

On November 2, 2005, a federal grand jury sitting in Camden returned a one-count Indictment against Defendant under 18 U.S.C. § 922(g)(1) and 2.  Defendant subsequently filed the instant suppression motion, and this Court heard oral argument on April 10, 2006.

## II.  DISCUSSION

The Court begins its discussion with the relevant constitutional text.  The Fourth Amendment to the Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV.  "To be constitutionally sound, search warrants must state probable cause and 'particularly describe the place to be searched, and the persons or things to be seized.'"

<u>Bartholomew v. Commonwealth of Pennsylvania</u>, 221 F.3d 425, 428
(3d Cir. 2000) (quoting U.S. Const. amend. IV).

Where a defendant challenges the issuance of a warrant under
the Fourth Amendment, the reviewing court need only determine
whether the magistrate had a "substantial basis" for concluding
that probable cause was present.  <u>Illinois v. Gates</u>, 462 U.S.
213, 238 (1983); <u>United States v. Ritter</u>, 416 F.3d 256, 262 (3d
Cir. 2005).  As the Supreme Court has instructed, "after-the-fact
scrutiny by courts of the sufficiency of an affidavit should not
take the form of de novo review."  <u>Gates</u>, 462 U.S. at 236.  This
standard reflects a substantial level of deference to be afforded
the magistrate's decision.  <u>Id.</u>

A.   <u>The Warrant is Not General</u>

Defendant argues first that the warrant authorizing the
search of his house was an impermissible general warrant because
it failed to particularize the place to be searched or the things
to be seized.  Therefore, Defendant maintains, the evidence
seized pursuant to the warrant must be suppressed.  For reasons
now explained, the Court holds that the warrant was not a general
warrant.

A general warrant is a warrant that authorizes "a general
exploratory rummaging in a person's belongings."  <u>Coolidge v. New
Hampshire</u>, 403 U.S. 443, 467 (1971).  The particularity
requirement of the Fourth Amendment "makes general searches . . .

impossible and prevents the seizure of one thing under a warrant describing another.  As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." <u>Marron v. United States</u>, 275 U.S. 192, 196 (1927).  "It is beyond doubt that all evidence seized pursuant to a general warrant must be suppressed." <u>United States v. Christine</u>, 687 F.2d 749, 758 (3d Cir. 1982).

In <u>Christine</u>, 687 F.2d at 749, an investigation of allegations of fraud conducted by the Inspector General's Office of the Department of Housing and Urban Development ("HUD") revealed information about a scheme in which the defendants, owners of a company, allegedly fraudulently procured HUD Title I Home Improvement Loans for uncreditworthy individuals.  The magistrate issued a warrant authorizing any postal inspector to search the defendants' office and to seize the following property:

> (a) all folders and all documents contained therein and all other documents relating to home improvements and home improvement contracts pursuant to the HUD Title I Insured Home Improvement Loan program;
>
> (b) all checks, check stubs and bank statements, deposit slips and withdrawal slips, reflecting the receipt and disbursement of funds through Landmark Builders, Inc. for the period January 1, 1977 to the present;
>
> (c) all general ledgers, general journals, cash receipt disbursement ledgers and journals for the period January 1, 1977 to the present;
>
> (d) all correspondence to and from and submissions

to Collective Federal Savings and Loan; and

> (e) all other documents, papers, instrumentalities and fruits of the crime of submission of false statements in connection with the HUD Title I Insured Home Improvement Loan program as well as any evidence of a scheme to defraud HUD or Collective Federal Savings and Loan or any other creditor by use of the United States mails.

Id. at 751.  In holding that the warrant was not a general warrant, the Court of Appeals explained:

> The warrant at issue cannot be invalidated as a general warrant for it does not vest the executing officers with unbridled discretion to conduct an exploratory rummaging through appellees' papers in search of criminal evidence.  Rather, the warrant's clauses describe in both specific and inclusive generic terms what is to be seized: "all folders . . . all checks . . . all general ledgers [and] all correspondence. . . ." By directing the searching officers to seize all of these items, the magistrate, rather than the officer, determined what was to be seized.  Neither is the final clause of the warrant ("all other documents, papers, instrumentalities and fruits of the crime") in the nature of a general warrant.

Id. at 753 (citing Andresen v. Maryland, 427 U.S. 463, 470-77 (1976)).

Similarly here, the Court finds that the warrant authorizing the search of Defendant's house and business was not a general warrant.  As recounted above, the warrant authorized the seizure of all documents within certain categories of financial records. Like in Christine, "[b]y directing the searching officers to seize all of these items, the magistrate, rather than the officer, determined what was to be seized."  687 F.2d 753. Moreover, the scope of items listed to be seized was limited by

11

time, and by category.  Finally, the introductory sentence further limits the type of documents to be seized to those in the name of, or on behalf of, Bishop Krabsz, and the entities in which he has a financial interest.

Moreover, the warrant was not "general" even though the search required the agents to examine documents to determine whether they were within the scope of the items to be seized.  As the Supreme Court has explained:

> In searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized. Similar dangers, of course, are present in executing a warrant for the "seizure" of telephone conversations. In both kinds of searches, responsible officials, including judicial officials, must take care to assure that they are conducted in a manner that minimizes unwarranted intrusions upon privacy.

427 U.S. 463, 482 n.11 (1976).

Here, the Court finds no evidence that the agents failed to exercise the appropriate level of care.  To be sure, Defendant points out that in executing the search the agents looked in such places as a dresser drawer and a shed.  However, as the Government argues, and as the affidavit accompanying the warrant sets forth, it is typical for individuals engaged in tax fraud and evasion to hide cash at their homes.  "Although the scope of the warrant was certainly extensive, the warrant was not general. . . .  It was indubitably broad, but it was not 'general.'"  United States v. Ninety-Two Thousand Four Hundred Twenty-Two

Dollars and Fifty-Seven Cents, 307 F.3d 137, 149 (3d Cir. 2002).

    B.   Warrant Identified Search Items and Locations With the Requisite Particularity

Next, the Court finds that the places to be searched and the items to be seized were identified with the requisite particularity.

The accompanying attachments to the warrant identify the locations to be searched by address, and in the case of the house, by aerial photograph.  The Court finds such descriptions sufficient, especially considering that the Government did not possess more detailed information as to the exact locations of the items within the home.  The Court should not expect more from the Government considering the nature of the crimes being investigated.

Moreover, the Court finds that the descriptions of the items to be seized were sufficient considering the nature of the crimes alleged.  Other courts too have considered the practical implications of identifying with particularity items that are being hidden.  See, e.g., United States v. Mathison, 157 F.3d 541 (8th Cir. 1998) (holding that because "fraud, by its nature, entails concealment," search warrant properly allowed search of all of defendant's financial and corporate records of 17 corporations potentially involved in the criminal activity); United States v. Hensen, 848 F.2d 1374 (6th Cir. 1988) (validating warrant generally describing various records of car

13

dealer where affiant "could not have known at the time he applied
for the warrant what precise records and files would contain
information concerning the odometer-tampering scheme"); see also
United States v. Spilotro, 800 F.3d 959 (9th Cir. 1986) (holding
document description unduly broad where affiant could have
provided a narrower description of the items to be seized).  As
the Supreme Court recognized in Andresen, "[t]he complexity of an
illegal scheme may not be used as a shield to avoid detection
when the State has demonstrated probable cause to believe that a
crime has been committed and probable cause to believe that
evidence of this crime is in the suspect's possession."  427 U.S.
at 480 n.10.

    For these reasons, the Court holds that descriptions in the
warrant of places to be searched and the items to be seized were
sufficient.

  C. <u>There Was A Substantial Basis For Finding Probable
   Cause to Find the Items Described in the Warrant at
   Defendant's Home</u>

    Defendant additionally contends that probable cause was
lacking to find the items identified at the Defendant's house.
The Court rejects this argument as well.

    A magistrate judge may find probable cause when, viewing the
totality of the circumstances, "there is a fair probability that
. . . evidence of a crime will be found in a particular place."
Illinois v. Gates, 462 U.S. 213, 238 (1983).  "One does not need

Supreme Court precedent to support the simple fact that the
records of illegal business activity are usually kept at either a
business location or at the defendant's home.  Likewise, personal
financial records are also usually stored at a person's home or
place of business."  <u>United States v. Abboud</u>, 438 F.3d 554, 572
(6th Cir. 2006).

Additionally, the Court finds that Judge Rosen had a
substantial basis to conclude that the agents had probable cause
to find at least certain of the items described by the warrant in
the shoe box where the gun was ultimately found.  Based on the
description of the items to be seized, among them checks,
withdrawal tickets, deposit slips and money cash bands, as well
as the fact that there probable cause to believe that the items
were being concealed, <u>see</u> <u>supra</u>, it was eminently reasonable for
the agents to search for those items in a shoe box in a clothes
closet.[5]  For these reasons, the Court finds that the magistrate
had a substantial basis for concluding that there was probable
cause to find evidence of tax fraud and evasion at Defendant's
house, and in particular, in the shoe box from which the gun was

---

[5] And, obviously, as the gun was in plain view, the agents
had probable cause to seize it.  <u>See</u> <u>Coolidge v. New Hampshire</u>,
403 U.S. 443 (1971) (explaining applicability of plain view
doctrine to circumstances where "police have a warrant to search
a given area for specified objects, and in the course of the
search come across some other article of incriminating
character"); <u>see</u> <u>also</u> N.J.S.A. 2C:39-2(b) and 2C:39-5(b)
(creating presumption of unlawfulness for possession of handguns
under New Jersey law).

seized.

Next, the Court rejects Defendants' attack on the
reliability of the Capra affidavit.  Capra is a Special Agent
with the Criminal Investigation Division of the IRS since 2001,
who has received basic and advanced training and has conducted
over 20 investigations of criminal tax violations.  (Capra Aff.
¶¶ 2 & 3.)  Defendant argues that the warrant improperly includes
the "conclusionary statement that people typically keep evidence
of tax related offenses anywhere within their control."  (Def.
Br. at 22.)  However, the Court finds, as in <u>Abboud</u>, that
"Defendant's claim that [this is a] conclusory statement[] . . .
misses the mark; the affiant is a seasoned . . . Special Agent
whose primary concentration is" tax-related crimes.  As such,
"the magistrate [judge] correctly relied on the affiant's
experience in his assessment of the probable location of the
evidence."  <u>Abboud</u>, 438 F.3d at 572.  It is common sense,
buttressed by observations of Defendant at his home with his
briefcase and receiving bills, that evidence of tax evasion could
be expected to be hidden in this residence.[6]  There was probable

---

[6] Defendant also challenges information contained in the
affidavit which was provided by a confidential informant
regarding a computer at Defendant's business and a statement that
the informant, who was employed by Krabsz, was paid in cash
without federal taxes being withheld.  The Court's inquiry here,
though, is limited to the issue of probable cause regarding
evidence of tax crimes at Defendant's home, not his business.
Thus, information provided by an informant regarding evidence at
Defendant's place of business is not relevant to the Court's

cause to believe that Defendant's tax crimes involved his individual taxes as well as his business-related tax obligations, and the most plausible location to find evidence pertaining to individual tax obligations is in the primary residence.  It is clear upon review that Judge Rosen had a substantial basis for finding probable cause that the evidence sought would be found in Mr. Krabsz's home in Cherry Hill.

     D.   <u>Alternatively, the Good Faith Exception to Exclusionary Rule Applies</u>

This Court has found that the warrant was lawful in all respects.  Even if, contrary to this finding, the warrant was deficient in some respect, a reasonable officer, executing the warrant, could rely upon it in a good faith belief in its propriety.  Accordingly, the Court finds the good faith exception to the exclusionary rule applicable here.

In <u>United States v. Hodge</u>, 246 F.3d 301 (3d Cir. 2001), the court stated that the "test for whether the good faith exception applies is whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."  <u>Id.</u> at 307 (quoting <u>United States v. Loy</u>, 191 F.3d 360, 367 (3d Cir. 1999)).  The court there continued: "The mere existence of a warrant typically suffices to prove that an

---

determination.  In any event, for reasons already stated the Court finds that the Capra Affidavit provided a substantial basis for the Magistrate Judge's finding of probable cause.

officer conducted a search in good faith and justifies
application of the good faith exception." Hodge, 246 F.3d at
307-08 (citing Leon, 468 U.S. at 922, and United States v.
Williams, 3 F.3d 69, 74 (3d Cir. 1993)).  Nonetheless, an
officer's reliance on a warrant would be unreasonable:

>     (1) when the magistrate judge issued the warrant in
>     reliance on a deliberately or recklessly false
>     affidavit;
>
>     (2) when the magistrate judge abandoned his
>     judicial role and failed to perform his neutral and
>     detached function;
>
>     (3) when the warrant was based on an affidavit "so
>     lacking in indicia of probable cause as to render
>     official belief in its existence entirely
>     unreasonable"; or
>
>     (4) when the warrant was so facially deficient that
>     it failed to particularize the place to be searched or
>     the things to be seized.

Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-
Seven Cents, 307 F.3d at 146 (quoting Williams, 3 F.3d at 74
n.4).

In United States v. Davis, 226 F.3d 346 (5th Cir. 2000), the
defendant appealed the denial of a motion to suppress evidence
seized following the execution of a search warrant at the
defendant's home and office.  The warrant "listed fifteen
categories of evidence to be seized, mostly various kinds of
financial records, both paper and electronic." Id. at 349.  The
warrant was based upon the affidavit of an FBI agent which
stated, among other things, that "bank records revealed hundreds

18

of thousands of dollars had come into the accounts of [the defendant's] firm . . . but that no tax returns had been filed for that company for" the relevant years.  Id. at 350.  The FBI seized 65 boxes of documents in the search, all of which the defendant moved to suppress.  After a hearing, the court denied the suppression motion.

Following a trial, the defendant was convicted of conspiracy, 18 § U.S.C. 371, wire fraud, 18 U.S.C. § 1343, travel and transportation of securities for fraudulent purposes, 18 U.S.C. § 2314, and money laundering, 18 U.S.C. § 1957, all in connection with his operation of "an advance-fee scheme."[7]   In affirming the judgment of conviction, the Court of Appeals rejected the defendant's argument that the trial court erred in failing to suppress the seized evidence.  In rejecting the defendant's Fourth Amendment challenge on appeal, the court held:

> the fifteen categories of evidence described in the
> warrant are delineated in as much detail as is
> practicable for investigating the kind of fraud
> indicated in this case.  We have held that warrants
> using generic categories of evidence are adequately
> particular where the crime being investigated is likely
> to require examination of all of a business's records.
> The affidavit indicated that there was reason to
> believe that [the defendant's business ] had failed to
> file required tax returns; proof that [the defendant's
> firm] had made money on which it owed taxes would
> require broad categories of [the firm's] records.
> Further, the warrant in this case shows that the
> officers made some attempt to narrow the categories of

_____

[7] Pursuant to this scheme, the defendant would agree to obtain funding for clients, but would never do so.

19

> evidence as much as possible.  For example, the warrant
> limited the documents to be seized by date or subject
> matter in many cases. . . .  It was therefore not so
> defective that an officer would be unreasonable to rely
> on it.

Id. at 352 (citations omitted).  Applying the Leon exception, the

court upheld the lower court's denial of the suppression motion.

Similarly here, the Court finds that the agents who executed

the warrant reasonably relied on it in executing the search of

Defendant's residence.  In the first instance, Defendant does not

contend either that the Magistrate Judge issued the warrant in

reliance on a deliberately or recklessly false affidavit, or that

Judge Rosen abandoned his judicial role and failed to perform his

neutral and detached function.  Next, as already noted, Defendant

does not challenge for present purposes the existence of probable

cause to believe Defendant committed tax crimes.

Finally, for reasons already explained, the Court holds that

the warrant was not so facially deficient that it failed to

particularize the place to be searched or the things to be

seized.  See Marvin v. United States, 732 F.2d 669 (8th Cir.

1984) (upholding validity of warrant in criminal tax

investigation where warrant described with sufficient

particularity "items likely to provide information concerning the

[defendants'] taxable income for the years involved"); In re

Application of Paperboard Sales, Inc., 291 F. Supp. 1018

(S.D.N.Y. 1968) (finding probable cause for issuance of search

warrant in income tax evasion investigation where papers which related to defendant's income were not only evidence of a crime but were "intended for use . . . as the means of committing a criminal offense"); cf. United States v. Diaz, 841 F.2d 1 (1st Cir. 1988) (upholding warrant describing items to be seized as all sales records and all accounts payable records, as nature of insurance fraud scheme such that "the government had to demonstrate that the total sales plus the total claimed losses of a certain produce exceeded the total amount purchased of that item").  But see In re Impounded Case (Law Firm), 840 F.2d 196, 200 (3d Cir. 1988) (finding it unnecessary to adopt "the broad proposition tendered by the government" that any document likely to show actual amounts received can properly be seized whenever there is probable cause to suspect that the crime of tax evasion or the crime of underreporting of gross income has been committed); United States v. Washington, 797 F.2d 1461, 1472-73 (9th Cir. 1986) (holding in tax evasion case that the section of the challenged warrant permitting officers to seize articles "tending to establish the wealth and financial status" of the defendant "impermissibly overbroad").  Like in Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents, 307 F.3d at 149, under the facts presented here "reasonable officers could have easily believed that the warrant was not even overly broad with respect to the categories of items to be

21

seized."

Moreover, though in both cases the warrant authorized the search for and seizure of "entire categories of legitimate business records, . . . it is critical to keep in mind that a principal purpose of the warrant[s] was to prove a negative . . . ."  Id.  In <u>Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents</u>, for example, a warrant was issued in connection with a wide-scale investigation of illegal trafficking of food stamps by Kim's Wholesale Distributor's Inc. ("Kim's"). The "principal purpose of the warrant was to prove . . . that Kim's had not engaged in legitimate business transactions with the sham groceries from which Kim's had received large cash payments."  Id.  In other words, it was necessary to examine a wide-range of categories of business records in order to determine whether evidence of legitimate business transactions with the grocery stores in question was lacking.

Similarly here, in order to show that Defendant did not report his total income to the IRS for the relevant time period, the Government needed to examine all documents reflecting Defendant's true income and deductions.  Stated another way, the Government needed to "recreate" Defendant's actual income and assets in order to prove that he had not filed accurate tax returns.  For these reasons, "a reasonable officer could easily have believed that the breadth of the warrant in this case was

justified." Id. at 150.

  E. Search was Properly Conducted

  Finally, Defendant argues that the agents conducted an unauthorized second search which yielded the gun after the initial search had concluded.  The Court heard testimony on this issue from one of the FBI Agents present during the search, as well as Defendant's live-in girlfriend, Lisa Bonett, who was also present.[8] For the reasons now explained, the Court credits the Government's explanation that the weapon seized was inventoried separately from the tax-related items simply because agents affiliated with independent agencies were responsible for the tax-related items and the firearm.

  The testimony offered by the defense does not discredit this version of the events.  Lisa Bonett claims that at 3:00 P.M. she was brought to the kitchen by an agent who directed her to sign the inventory of the items seized.  (Bonett Aff. ¶¶ 8, 9.) According to Bonett:

> At the time that I signed the inventory it appeared that the search had been concluded.  Agents were leaving and taking items out of the house. Approximately ½ hours thereafter, at about 3:30 p.m., I was directed to the area of the dining room by another agent and asked to sign a property receipt for a firearm.

(Id. at ¶¶ 9, 10; 8/3/06 Bonett Testimony.)

  Nothing Ms. Bonett stated, however, indicates that the

---

  [8] Defendant was not at home during the search.

firearm was discovered and seized approximately 30 minutes after the search had been completed.  Indeed, Ms. Bonett recalls that the search had concluded even <u>before</u> she signed the IRS inventory at approximately 3:00 P.M.  Moreover, Ms. Bonett did not testify, as Defendant maintains, that the agents left the property after the initial search and "about 30 minutes later . . . returned to the residence, headed to the bedroom, and found the firearm in a shoe box on the top shelf in a walk-in clothes closet."  (Def. Recon. Br. at 8.)  Quite differently, Ms. Bonett merely stated that she was not asked to sign an inventory until 30 minutes after "<u>it appeared</u>" that the search was complete.  That two inventories were prepared separately should not call into question the legitimacy of the otherwise lawful search.  As detailed above, the gun was seized between 11:30 and 11:45 A.M., according to Special Agent Huber, during the course of the entire search, and the inventory for the gun was presented to Ms. Bonett about three hours later.

    For these reasons, the Court finds that a single, lawful search of Defendant's home was conducted pursuant to a legitimate search warrant.  Accordingly, the gun seized pursuant to that search should not be suppressed merely because it was inventoried separately from the tax-related items which were also properly seized during that search.

## III. CONCLUSION

Upon Defendant's reconsideration motion, the Court will vacate its June 2, 2006 Opinion and Order.  For the reasons explained above after consideration of all arguments and evidence, the Court finds that the search of Defendant's home was conducted pursuant to a legitimate search warrant and did not otherwise offend the Fourth Amendment.  Accordingly, Defendant's suppression motion will be denied.

An appropriate Order will be issued together with this Amended Opinion.


__August 31, 2006__          __s/ Jerome B. Simandle__
Date                         JEROME B. SIMANDLE
                             U.S. District Judge